IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2001 JUL 30  A 11: 40

CLERK'S OFFICE
AT BALTIMORE

_____DEPUTY

JAY L. ARMSTRONG

v.                              CIVIL NO. CCB-00-594

SEALY MATTRESS COMPANY

### MEMORANDUM OPINION

Jay Armstrong claims that his former employer, the Sealy Mattress Company, failed to promote him for racially discriminatory reasons, and that he was fired in retaliation for filing an unrelated complaint with the Equal Employment Opportunity Commission [EEOC] and for oppositional activities. Sealy has moved for summary judgment.

I.

Sealy Mattress Company makes mattresses at a plant in Williamsport, Maryland. The plant operates on two shifts, one beginning around 6 AM and the other around 6 PM, and workers were expected to stay until their assigned work was done; there was no fixed end of shift.

Armstrong started work for Sealy in December 1996 as a hog ringer, assigned to put fabric on a box spring's frame. After a few months, Armstrong became a line loader. Line loaders were responsible for setting up the materials used by the hog ringers working on their shift, and also for laying out materials ready for the next shift and cleaning up their area. The



line loaders accordingly worked later than the hog ringers. In addition, a line loader must be able to lift twenty to thirty pounds, but a hog ringer has no such lifting requirement.

According to Armstrong, in late 1997, he "started to . . . speak out" about what he perceived as discrimination against African-American employees at the plant, including Haitian immigrants. Opp'n Ex. 1 at 42-43, 45-46. He spoke to Lindy Reese on at least one occasion. In general, he believed that supervisors at the plant believed that African-American employees were only capable of physical labor, which he describes as "real big strong lifting" and which he says other employees at the plant described to him as "a bunch of nigger work." Opp'n Ex. 1 at 117.[1] In January 1998, he himself was treated differently by being assigned to a different department when on light duty, whereas, he says, three white hog ringers remained in their departments at unspecified times while on light duty. Mot. Ex. 1 at 35-36. (Also in March or April 1998, he says that he and another African-American employee were told to stop selling candy and soda on the factory floor, while other white employees including Rocco Capriolo continued to sell the same candy on the floor; Armstrong did not complain about this specific disparity, nor does he know of anyone who did. Opp'n Ex. 1 at 54-57.) In April 1998, management ignored a case of a white employee found sleeping during his shift; by contrast, an African-American employee who had fallen asleep at another time after a sixteen-hour shift was surrounded by "every supervisor in the whole plant," awoken, "humiliated," and suspended for three days. Opp'n Ex. 1 at 79-80.

In response to his protests, Armstrong says that management "started to focus on me" for being "too outspoken." Opp'n Ex. 1 at 43. In March or April 1998, one of Armstrong's

---

[1] Armstrong also notes that Sealy had to repaint the bathrooms every few weeks because people wrote racist graffiti including the word "nigger" on it. Opp'n Ex. 1 at 169.

supervisors, Dan Rule, searched Armstrong's belongings in the belief that Armstrong was violating rule barring the sale of goods by employees on the premises. Rule found nothing. Sealy disciplined Rule for the search, and did not discipline Armstrong. On June 25, 1998, Armstrong filed an EEOC charge related to the search. Mot. Ex. 5. The commission dismissed the charge on July 14, 1998.

Armstrong has never applied for a supervisory position at Sealy. When Henry Plummer was promoted to the position of working lead, Armstrong asked the plant manager why Plummer rather than he himself had been chosen. He says that O'Brien replied that Armstrong was "too smart before your time," and that O'Brien acknowledged that Armstrong had "the most seniority, . . . , most experience, [and] most knowledge of the job, but I don't deal with people like you." Opp'n Ex. 1 at 124. Armstrong believes himself to be better qualified for the position, but acknowledges that nothing in his employment record clearly showed that he was qualified for a supervisory position. Mot. Ex. 1 at 160, 162.

At work on August 11, Armstrong spoke to Plummer, his working lead, and the two estimated that the work for their shift should be finished at 4:30 or 5 AM. Armstrong says that this conversation did not involve setting a deadline, but merely estimating the size of the task. Opp'n Ex. 1 at 95. Armstrong says he completed his assignment and left work at 4:03 AM. He did not check in with Plummer or Sherman Lynn, another supervisor, before leaving. According to Armstrong, the norm at the plant was to leave when you had completed your own assignment, without requesting permission from anyone; he says no one ever told him there had been a change to that long-standing practice. Opp'n Ex. 1 at 92-93. The other employees on the same shift left work after 4:30 AM. (According to Armstrong, it was common practice among some

other employees to hang around after their shifts, doing nothing and being paid for it, in a practice known as "milking the clock." Opp'n Ex. 1 at 94.) The next morning, Armstrong was told that he had been fired for leaving work early.

II.

Armstrong first claims that Henry Plummer was chosen over him to be promoted to working lead for racially discriminatory reasons. Armstrong admits that he never applied for a supervisory position at Sealy. Mot. Ex. 1 at 156-57. Accordingly, he cannot establish a prima facie case of a racially discriminatory failure to promote him into such a position. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959-60 (4th Cir. 1996) (requiring that a plaintiff show that he or she applied for the position in question to establish a prima facie case of a racially discriminatory failure to promote). Although it is unclear on the record, the Court might conclude that the working-lead position was not advertised and that Armstrong accordingly did not have to apply for it to state a claim of a discriminatory failure to promote. However, Armstrong's case fails for a separate reason. He cannot establish pretext; his only evidence that he was more qualified than Plummer to be the working lead is his own opinion, evidence that is insufficient as a matter of law to establish that Sealy's asserted reason for promoting Plummer instead of Armstrong was pretextual. Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 763 (4th Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999); Vaughan v. Metrahealth Cos., Inc., 145 F.3d 197, 202 (4th Cir. 1998), abrogated on other grounds, Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000); Evans, 80 F.3d at 959.

-4-

Armstrong also claims that he was terminated in retaliation for filing a claim with the Equal Employment Opportunity Commission [EEOC]. In order to establish a prima facie case of retaliatory termination, Armstrong must prove "(1) that [he] engaged in protected activity; (2) that the employer took adverse employment action against [him]; and (3) [that] a causal connection existed between the protected activity and the adverse action." McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991); see also Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). An EEOC filing is a protected activity and being fired is an adverse action. Sealy argues that Armstrong fails to establish a prima facie case on the third element (and fails for similar reason to establish pretext). Although he has had an opportunity to respond to Sealy's motion raising the issue, Armstrong has not shown direct testimony or other evidence from which it could reasonably be inferred that anyone at Sealy was aware of his EEOC complaint. See Mem. in Supp. of Mot. at 5; Mot. Exs. 5-6. Knowledge is a necessary component of causation. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998); see also Gibson v. Old Town Trolley Tours of Washington, 160 F.3d 177, 182 (4th Cir. 1998). Accordingly, Armstrong cannot establish a prima facie case of retaliatory termination based on his EEOC complaint, and Sealy is entitled to summary judgment on Armstrong's termination claim based on his EEOC complaint.

Armstrong further claims that he was fired because he "spoke out about discriminatory employment practices in the workplace." Opp'n at 8. Over time beginning at the start of 1998, he objected in general to worse treatment of African-American employees, and in specific that African-American employees, but not white employees, were transferred out of their departments if they were on "light duty," and that an African-American employee who fell asleep on the job

was treated much more harshly than a white employee who did the same.[2] Opp'n at 9.  With respect to light duty, Sealy notes that the white employees to whom Armstrong points were hog ringers, who did not have the lifting requirements to which line loaders like Armstrong were subject.  It was thus easier to keep line loaders on light duty within their department.

Armstrong does not specify when he spoke against each of these practices or to whom he spoke.  He does specify that he complained to Lindy Reese about some issues, Opp'n Ex. 1 at 45; of course, Lindy Reese was not the person who fired him.  He never mentions complaining to O'Brien, who actually fired him, except about the failure to promote him.  In addition, the time that elapsed between his protests and his termination in August 1998 is unclear.  He has failed to make any specific showing of a causal link between his protests and his termination.  Although the Court could theoretically infer a causal link from the timing involved, Armstrong's account is so vague as to the timing that no basis is presented for that inference.  With respect to oppositional activity, Armstrong has failed to state a prima facie case of retaliatory termination, on the element of causation.

For these reasons, the Court will grant Sealy's motion for summary judgment.

July 30, 2001

_____
Catherine C. Blake
United States District Judge

---

[2] Although Armstrong also says that white employees were permitted to continue selling candy on the factory floor when African-American employees were stopped from doing so, he says he did not complain about that disparity and is unaware of anyone who did.  Opp'n Ex. 1 at 56-57.